**Clyde L. SISCO, Appellant,**

v.

**J. S. ALBERICI CONSTRUCTION COMPANY, INC., Appellee.**

**No. 80–1420.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1981.

Decided July 29, 1981.

Michael J. Hoare, argued, Chackes & Hoare, St. Louis, Mo., for appellant.

Samuel C. Ebling, argued, Guilfoil, Symington, Petzall & Shoemake, James E. Robertson, Millar, Schaefer & Hoffmann, St. Louis, Mo., for appellee J. S. Alberici Const. Co., Inc.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

1. The Honorable James H. Meredith, Senior United States District Judge for the Eastern District of Missouri.

ARNOLD, Circuit Judge.

Clyde L. Sisco appeals from the judgment of the District Court[1] dismissing his claim for damages for unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under 42 U.S.C. § 1981. He seeks relief against the J. S. Alberici Company, alleging that he was discharged from employment because of his race. Sisco also claims that the District Court wrongly denied his request for a jury trial. We affirm in part and reverse in part.

## I. THE FACTS

Alberici, which engages in the construction business nationally and in the St. Louis, Missouri, area, was awarded a contract by the federal government to perform work on the United States Post Office Fixed Mechanization Project at St. Louis. The contract was subject to an affirmative-action plan promulgated pursuant to Parts II and III of Exec. Order No. 11246, 42 U.S.C. § 2000e note, and entitled the "St. Louis Plan." The Plan was designed to correct a "pattern of recruitment, hiring, training, referral, and access to union membership that had resulted in the exclusion of minority group persons from . . . meaningful representation in the construction industry." 41 C.F.R. § 60–7.10 (1974). The Plan provided, among other things, that certain goals were to be met on the basis of minority personnel working in each specified trade on each of a given contractor's projects, whether federally funded or otherwise, within the City and County of St. Louis during the term of the covered contract. Goals were established for the number of minority hours of employment calculated as a percentage of total hours of employment. For the period ending December 31, 1974, the goal for ironworkers was 7.6 to 9%. For calendar year 1975, the goal was increased to a level of from 9 to 10.4%.

Alberici was required to complete and submit reports to the United States Department of Labor on the percentage of minority employment. The first report on the Post Office project had a beginning date of October 23, 1973. No black ironworker was employed on this project until January 22, 1974. For the reporting period of October 30, 1974, through November 26, 1974, minority "man-hours" amounted to 24% of total man-hours. During that time, there was one minority employee out of a total of four ironworkers. For the December, 1974, reporting period, only 4% of the man-hours were worked by minority employees. Thereafter, the minority percentage rose back up to acceptable levels, in part because of Sisco's transfer, the circumstances of which we will now describe.

Clyde Sisco, a white male, was employed as an ironworker on the Post Office project. He also held the position of union steward. During the course of work on the project, Alberici determined that it did not need four ironworkers, but that in order to maintain compliance with the St. Louis Plan, a cutback in its force required the maintenance of at least one minority ironworker on the site. Consequently, Sisco and another white ironworker were laid off, while the only black ironworker and the crew foreman, a white male, were retained. Sisco protested this action and informed Alberici that, under the Ironworkers Collective Bargaining Agreement, Sisco, as union steward, was entitled to special treatment. Under the Agreement, the steward is supposed to be "the last man laid off."

Because Sisco "refused to cooperate," a meeting subsequently was held and attended by John C. Bartnett, then the Equal Employment Opportunity (EEO) officer for Alberici, representatives of the union, and Sisco. The parties agreed that the Agreement gave Alberici the right to close down completely the work at the Post Office project site and transfer all ironworkers, including Sisco, to other jobs. After that,

Alberici could reopen the project site and assign workers there in compliance with both the Agreement and the St. Louis Plan.

Sisco, along with other workers, was transferred to Alberici's fabrication shop. He and several workers were later transferred to the Chevrolet plant run by Alberici. On December 6, 1974, that plant closed for a period of time, and Sisco was laid off. Shortly thereafter, Sisco went to work for several other construction companies. Although he did not file a grievance with his union, Sisco did file a complaint with the Equal Employment Opportunity Commission (EEOC) on March 14, 1975.[2] He was issued a notice of right to sue from the EEOC on June 1, 1977, and this action was brought on July 27, 1977.

Sisco's appeal raises the following issues: (1) whether reliance on the St. Louis Plan by the J. S. Alberici Company is an affirmative defense as a matter of law to Sisco's claim of unlawful discrimination; (2) whether Sisco has a cognizable claim for retaliation under 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 1981; and (3) whether the District Court erred by denying his request for a jury trial.

After the oral argument in this case, another panel of this Court decided *Setser v. Novack Inv. Co.*, 638 F.2d 1137 (8th Cir. 1981). For convenience, we will refer to this panel opinion as *Setser I*. There, the Court held (1) that § 1981 actions are triable as of right to a jury, *id.* at 1139–43, and (2) that "a § 1981 cause of action . . . encompasses . . . allegations of retaliatory conduct . . . ." *Id.* at 1147. In addition, Part II of the opinion in *Setser I* discusses the circumstances in which an affirmative-action plan is a defense to a claim of reverse discrimination. This part of the opinion was, in legal effect, withdrawn when this Court ordered the case, insofar as Part II of the panel opinion was concerned, reheard en banc. Rehearing en banc was not ordered with respect to Parts I (jury trial) and III (retaliation) of the panel opinion.

---

**2.** The EEOC determined that there was reasonable cause to believe that Alberici had discriminated against Sisco because of his race and had

retaliated against him because he opposed conduct unlawful under 42 U.S.C. § 2000e.

After the rehearing, this Court filed a new opinion, *Setser v. Novack Inv. Co.,* —— F.2d ——, No. 80–1100 (8th Cir. July 21, 1981) (en banc), which we shall call *Setser II.* In the en banc opinion, the Court lays out the law on the subject of affirmative-action plans as a defense. In brief, an employer who in good faith applies an affirmative-action plan to remedy past discrimination is not in violation of either Title VII or Section 1981, so long as the plan lasts no longer than necessary "to eliminate a manifest racial imbalance," "does not unnecessarily trammel the interests of the white employees," "does not require the discharge of white workers and their replacement with new black hirees," and does not "create an absolute bar to the advancement of white employees . . . ." *United Steelworkers v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). Thus, the law in this Circuit is now clear on each of the three questions presented by Sisco's appeal. The jury-trial and retaliation issues are settled by the panel opinion in *Setser I,* and the use of the affirmative-action plan as a defense is governed by the opinion of the Court en banc in *Setser II.* We are of course bound by these holdings. We now proceed to apply them to the case before us.

## II. THE LEGAL QUESTIONS

### A. Trial by Jury

■ The jury-trial question is concluded in this Circuit by *Setser I.* The District Court (acting before *Setser I* was decided) struck plaintiff's demand for trial by jury. Since plaintiff here pleaded not only a disparate-treatment claim under Title VII, but also a § 1981 claim, he was entitled to trial by jury under the Seventh Amendment.

### B. The Affirmative Action Plan

It does not automatically follow, however, that the judgment must be reversed, and the cause remanded for a complete new trial before a jury. It remains our duty to inspect the record and determine if defendant would in any event be entitled to judgment as a matter of law. Compare *Setser I,* 638 F.2d at 1142–43. Here, the District

Court, in its findings of fact and conclusions of law entered after the bench trial, squarely held, relying, *inter alia,* on *Weber,* that "defendant's actions pursuant to the St. Louis Plan are permissible under the circumstances in this case." *Clyde L. Sisco v. J. S. Alberici Constr. Co.,* No. 77–0810–C(c), slip op. at 14 (E.D.Mo., April 24, 1980). This holding is fully consistent with the standards recently laid down in *Setser II,* and the validity of the affirmative-action plan itself is, as *Setser II* explains, a question of law to be decided by the court, not the jury.

■ Here the employer adopted the affirmative-action plan because it had to do business with the United States. It was under pressure from government officials to improve its percentage of minority hours worked. There was a history of exclusion of black workers from the ironworkers' trade in St. Louis. Alberici had decided, for reasons wholly unrelated to race or to Sisco personally, to reduce its force of ironworkers at the Post Office from four to two. In order to accomplish that goal without further worsening its ratio of minority hours, the black ironworker (who had been on the job site longer than Sisco and whose qualifications are not questioned) had to be retained. Of the two employees left, one was white. The St. Louis Plan was temporary, in the sense that its goals were expressed in terms of percentages of hours worked; once the percentages were met, no further action by the company was required. Sisco was not replaced by a new black worker. A qualified black employee with more seniority on the job site was simply retained in preference to Sisco and another white man. For these reasons, we hold that Alberici's initial decision to remove Sisco from the Post Office job was not unlawful.

### C. Retaliation

■ Sisco also claims that his subsequent lay-off from the Chevrolet site, and the failure thereafter of Alberici ever to hire him again, was unlawful retaliation. This portion of the case must be remanded for

trial to a jury. We have carefully reviewed the record, including the transcript of testimony and the exhibits, and we are unable to say that Sisco failed to make a submissible case on the question whether Alberici's conduct was motivated by a desire to retaliate against Sisco because he objected to what he believed was racial discrimination.

Sisco asserts a retaliation claim under both Title VII and 42 U.S.C. § 1981. The relevant portion of Title VII, 42 U.S.C. § 2000e–3, reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Section 1981 has no specific retaliation provision, but, as we have noted, *Setser I* holds that retaliation, in a racial-discrimination context, can violate this provision.

The transfer of ironworkers from the Post Office project, which Sisco opposed, was not unlawful, as we have held above. We agree, however, with the District Court in *Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685, 688 (D.Minn.1977), that "as long as the employee had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII." The Seventh and Ninth Circuits have cited with approval this holding in *Hearth*. See *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041 (7th Cir. 1980); *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978). Compare *Setser I*, 638 F.2d at 1146, holding that Section 1981 forbids "a retaliatory response by an employer against . . . an applicant who genuinely believed in the merits of his or her complaint . . . ."

Sisco objected that his removal from the Post Office site was unlawful racial dis-crimination. We cannot say that this belief was unreasonable or in bad faith, even though we today hold, based largely on case law developed long after the events in issue, that the company's reduction in force was not unlawful. A person in Sisco's position could reasonably have believed, especially in 1974, that racial discrimination in violation of law had occurred [3]. There is also sufficient evidence in the record to make out a jury issue on the question of the employer's motivation. Sisco had worked for Alberici almost continuously for eight years before the post-office incident occurred. Alberici's Mr. Bartnett testified that he "wasn't tickled" with Sisco's resistance to the implementation of the affirmative-action plan. There is evidence that when Sisco was finally let go on December 6, 1974, there was still some work to be performed at the Chevrolet site. Sisco never re-applied to Alberici for a job, but his wife did call Ray Pieper, a vice-president of the company, for whom she had done secretarial work, and told him her husband needed a job. According to Mrs. Sisco, Pieper agreed to check into the matter and call her back, but he never did so. According to Raymond Swarts, Sr., the foreman on the St. Louis post-office project in 1974, Red Weaver, who supervised the work at the Chevrolet plant, said "he has to leave Sisco go, he had orders from the office." And in June or July of 1977, according to Swarts, Weaver said, in Sisco's presence, "My hands are tied. I cannot hire him." A jury could permissibly find on this evidence (though it certainly would not *have* to) that Alberici simply decided to get rid of Sisco and never hire him again because he had protested what he believed to be unlawful treatment. In short, if the case had been tried to a jury, as we hold it should have been, Alberici would not, on this record, have been entitled to a directed verdict on the issue of retaliation.

It follows that the case must be tried again, this time to a jury, but only on the issue of retaliation. Sisco advanced a retaliation theory not only under Section 1981,

---

**3.** Apparently the EEOC did believe it. See note 2 *supra*.

but also under Title VII. The Supreme Court has indicated that Title VII cases are not triable as of right to a jury. See *Lehman v. Nakshian,* —— U.S. ——, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). The issue of whether Alberici's conduct in laying Sisco off from the Chevrolet job, and thereafter failing to rehire him, was attributable to a desire to retaliate against Sisco for his protest against being removed from the Post Office job, is an issue of fact common and crucial to the retaliation claim either under Section 1981 or under Title VII. Under well-established doctrine, an issue of fact common to a legal and an equitable claim must be tried to a jury, lest Seventh Amendment rights be extinguished by collateral estoppel if the equitable claim is tried first to the court. See *Setser I,* 638 F.2d at 1141 & n.8. The District Court may wish to submit the case to the jury on special interrogatories as to retaliatory intent and damages, but we leave the method of trial to its sound discretion. If on the new trial Sisco presses his prayer for reinstatement, and if the jury verdict on the issue of retaliation is in his favor, whether to award the equitable relief or reinstatement will be for the court to decide. Ordinarily reinstatement follows a finding of Title VII or Section 1981 liability in employment-discrimination cases, but there can be extraordinary circumstances that would make this remedy inequitable. We imply no view on the merits of this question.

The judgment, insofar as it dismissed Sisco's claim arising out of his removal from the post-office job because of the St. Louis Plan, is affirmed. As to the retaliation claim, the judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion. Each side is to bear its own costs on this appeal. Since it remains to be seen whether Sisco will prevail on any aspect of his case, attorneys' fees are not allowed at this time.

It is so ordered.